(No. 30514.

CHARLES F. CREMER *et al.*, Appellants, *vs.* PEORIA HOUS-
ING AUTHORITY *et al.*, Appellees.

*Opinion filed March 18, 1948.*

VERLE W. SAFFORD, of Peoria, for appellants.

WILLARD B. GASKINS, of Peoria, and WERNER W. SCHROEDER, RUBIN G. COHN, and CONCANNON, DILLON, SNOOK & ARTHUR, all of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiffs, Charles F. Cremer and Alvyn C. Boldon, qualified taxpayers, brought an action in the circuit court of Peoria County against the defendants, Peoria Housing Authority, Illinois Valley Homes, Inc., Nettleson-Baldwin-Anderson, Inc., and Mercantile Mortgage Corporation, seeking to set aside a real-estate contract between the two first named defendants and all deeds, mortgages and agreements arising therefrom, and to restrain all defendants from performing existing contracts or executing new ones of a similar character. Basically, the action is an attack upon the constitutionality of an act entitled, "An Act to facilitate the development and construction of housing, to provide governmental assistance therefor, and to repeal an

Act herein named," otherwise known and herein referred to as the 1947 State Grant Act. (Ill. Rev. Stat. 1947, chap. 67½, pars. 53-62.) The act repealed, the 1945 State Grant Act, is also involved. (Laws of 1945, pp. 946-9.) By their joint answer, Peoria Housing Authority and Illinois Valley Homes, Inc., admitted the facts alleged in the complaint but denied that the 1945 and 1947 State Grant acts were unconstitutional. Separate motions by the other defendants to strike the complaint were taken with the case. After a hearing on the merits, the chancellor found that all acts and threatened acts of defendants were valid and legal, and dismissed the cause for the want of equity. The constitutionality of legislative enactments being at issue, plaintiffs have prosecuted a direct appeal to this court.

The principal defendant, Peoria Housing Authority, is a municipal corporation created pursuant to the provisions of the Housing Authorities Act of 1934. (Ill. Rev. Stat. 1947, chap. 67½, pars. 1-27d.) In addition to establishing a State Housing Board, the Housing Authorities Act provides for the creation of local housing authorities upon application made by any city having over 25,000 inhabitants, or any county, regardless of size. Certificates of incorporation are issued by the State Housing Board upon a finding that there exists within the geographical limits of the applicant either unsafe or unsanitary inhabited dwellings or overcrowding of safe and sanitary dwellings by persons unable to afford adequate housing accommodations. Each city and county authority is composed of five unsalaried commissioners, appointed locally, and such assistants and employees as may be selected by the commissioners. Designated as bodies both corporate and politic exercising essential governmental functions, authorities are endowed with all powers necessary and appropriate to engage in low-rent housing and slum-clearance projects. Specifically, local authorities are empowered to conduct hearings and

investigate housing conditions, to acquire property by purchase, lease or eminent domain, to construct, manage and operate housing projects, and to sell, exchange or lease real and personal property. Without the power to levy taxes, funds for commencing operations can be acquired only by the sale of bonds or by gift or grant from the Federal, State or municipal governments, or any agent or instrumentality thereof. Co-operation with the Federal government is encouraged by special grants of power and the creation of housing authorities has been made more acceptable to local communities by adding a provision requiring that, in the absence of an agreement as to a greater or lesser sum, five per cent of gross income from shelter rentals of housing projects shall be paid as a service charge to the city or county for which the authority was created. Subject to a many-pronged attack on constitutional grounds, the validity of the Housing Authorities Act of 1934, as amended, was confirmed in *Krause* v. *Peoria Housing Authority*, 370 Ill. 356.

The Housing Cooperation Law of 1937 provides assistance to housing authorities by declaring that it is a proper public and corporate purpose for any local governmental body to aid any housing authority operating within its boundaries. (Ill. Rev. Stat. 1947, chap. 67½, pars. 28-35.) In particular, municipal governments are authorized to sell, lease or dedicate land to housing authorities, to establish recreational facilities, to furnish improvements, to supply office space and loan employees, to purchase housing authority bonds and, finally, to lend money and make donations.

Housing authorities continued to be supported by local governments and agencies and instrumentalities of the Federal government until the passage of the first State Grant Act in 1945. (Laws of 1945, pp. 946-9.) By this enactment, $10,000,000 was appropriated to the State Housing Board for the purpose of rendering direct financial assistance to local housing authorities, the amount of the grants

to be determined on the basis of the ratio of population between the local authority and the State as a whole. In 1945, slum clearance was still the paramount legislative intent. Grants for the construction of low-rent housing were conditioned upon agreements providing for the clearance or rehabilitation of slum dwellings substantially equal in number to the low-rent dwellings to be constructed. Only in the event of a housing shortage in the particular locality could the slum-clearance project be postponed. In addition, the 1945 State Grant Act provided for the creation of land clearance commissions, municipal corporations having powers coextensive with housing authorities with the single exception that the authority to build or operate housing was denied. Further provision was made empowering both housing authorities and land commissions to exchange, sell or lease real property acquired with grants to housing corporations, neighborhood redevolpment corporations, insurance companies, and any individual or corporation presenting an adequate plan for the development of the property together with a substantial bond conditioned on the completion of the project.

The comprehensive program of housing legislation enacted by the General Assembly in 1947 necessitated the repeal of the 1945 State Grant Act. Land clearance commissions were placed under a separate statute, known as the Blighted Areas Redevelopment Act of 1947, (Ill. Rev. Stat. 1947, chap. 67½, pars. 63-91,) and the sum of $10,000,000 was appropriated for grants in aid to them, conditioned on matching contributions from the local governmental body. Parenthetically, it may be noted that slum property so acquired must be cleared and sold to private interests at its use value, rather than the potentially higher acquisition cost, and that purchasers are not limited to redevelopment by construction of low-rent housing. The 1947 State Grant Act repeals the 1945 act, makes a showing of a need and a statement of proposed uses the only prerequisites

to the allocation of further grants to housing authorities and land commissions, provides for the distribution of funds on the basis of population without the requirement of matching funds from local governments, and broadens the uses and purposes for which the grants may be used by local authorities. (Ill. Rev. Stat. 1947, chap. 67½, pars. 53-62.) The appropriation to the State Housing Board for grants to local authorities under the 1947 act amounted to $6,567,000. The remaining housing legislation enacted into law in 1947 relates to the rehousing of persons of low income residing in redeveloped slum areas. (Ill. Rev. Stat. 1947, chap. 67½, pars. 92-95.) Housing authorities desiring to construct low-rent housing projects primarily for the occupancy of persons displaced by slum-clearance programs are eligible to grants in aid from a fund of $3,333,000 established for the purpose, the principal proviso being that local governments must make matching contributions.

Pursuant to the 1945 and 1947 State Grant acts, the Peoria Housing Authority, upon application to the State Housing Board, received funds derived from the general revenues of the State in the amounts of $133,070 and $87,386, respectively. Thereafter, at some undisclosed date, the housing authority purchased certain vacant lands in the city of Peoria. Admittedly, the property thus acquired is not located in a blighted or slum area. The purchase money, together with further sums expended for the installation of streets and sewers, aggregated approximately $72,106, all derived from the funds allocated to the authority, pursuant to the State Grant acts.

In October, 1947, the Peoria Housing Authority offered the property for sale, but no bids were received. Subsequently, the defendant, Illinois Valley Homes, Inc., a non-profit corporation, offered to purchase the property for $72,106, to be paid by a long-term note for this sum, secured by a mortgage junior and subordinate to a con-

templated construction mortgage. With the offer, the nonprofit corporation submitted a plan for the development of the property by the construction and rental of 25 two-story apartment buildings containing 136 dwelling units. Following the approval of the offer and plan by the State Housing Board, the Peoria Housing Authority passed an ordinance accepting the proposal. On November 20, the housing authority executed a conveyance to the nonprofit corporation and received the grantee's note for $72,106, due twenty-five years after date, with interest at four per cent after maturity. The mortgage securing the note was made junior to a first mortgage in the amount of $1,370,600 executed the same day by and between the nonprofit corporation, as mortgagor, and the defendant, Mercantile Mortgage Corporation, as mortgagee. The first mortgage was a construction mortgage and when the complaint was filed on November 22, 1947, the nonprofit corporation was about to enter into a contract with defendant Nettleson-Baldwin-Anderson, Inc., general contractor, for the construction of housing units in accordance with the plan of development submitted to the housing authority.

At the hearing, plaintiffs introduced in evidence the ordinance authorizing the sale of the property, the deed to the nonprofit corporation, the nonprofit corporation's note and first mortgage in favor of the mortgage company, and the note and second mortgage to the housing authority. J. Fletcher Lankton, one of the commissioners of the Peoria Housing Authority, and Temple McFayden, chairman of the Illinois Housing Board, appeared as witnesses for defendants. Lankton described the purchase and improvement of the property in question, the plan of development submitted by Illinois Valley Homes, Inc., and stated that a housing shortage existed in Peoria. Over plaintiffs' objection, McFayden was permitted to read into the record a detailed statement relative to the existence of a housing shortage in the urban areas of Illinois, the purposes and

effects of existing housing legislation and the practical operation of the 1945 and 1947 State Grant acts and the device of the nonprofit corporation in providing much needed housing.

In contending that the 1945 and 1947 State Grant acts are unconstitutional, plaintiffs rely upon four distinct sections of our organic law. The propositions propounded may, however, be reduced to two basic arguments. Plaintiffs first assert that the legislation attacked does not serve a public purpose and therefore amounts to a direct violation of sections 16 and 20 of article IV and section 2 of article II of the constitution of Illinois. The only language in section 16 of article IV relative to the case at bar is the prohibition that "The general assembly shall make no appropriation of money out of the treasury in any private law." The section referred to is totally without application here. As succinctly stated in *Hagler* v. *Small*, 307 Ill. 460, the only precedent touching on the subject, the quoted provision "does not prohibit an appropriation to a private person but prohibits appropriations for any purpose in a private law." Section 16 merely prohibits the former practice, prevalent prior to the adoption of our present constitution, whereby laws were designated as either "public" or "private," and State funds were sometimes appropriated in connection with acts of a purely "private" character. Manifestly, the 1945 and 1947 State Grant acts are public laws.

In the same argument, plaintiffs urge a consideration of section 2 of article II providing, "No person shall be deprived of life, liberty or property, without due process of law." It is well settled that the taking of taxpayers' money for a private purpose is a violation of the due-process clause. (*People ex rel. Greening* v. *Bartholf*, 388 Ill. 445; *Winter* v. *Barrett*, 352 Ill. 441; *Chicago Motor Club* v. *Kinney*, 329 Ill. 120; *Robbins* v. *Kadyk*, 312 Ill. 290.) The fundamental principle of the unconstitutionality of appropriating public funds for a private purpose is stated

in a more forthright manner in section 20 of article IV, providing, "The state shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual." As frequently announced, this section does not prohibit appropriations of State funds to private corporations or individuals where the money appropriated is to be spent for a public purpose. *People ex rel. Greening* v. *Green,* 382 Ill. 577; *People ex rel. McDavid* v. *Barrett,* 370 Ill. 478; *Hagler* v. *Small,* 307 Ill. 460; *Illinois Farmers' Institute* v. *Brady,* 267 Ill. 98; *Boehm* v. *Hertz,* 182 Ill. 154.

After stating the general rule of section 20, plaintiffs make the incontestable assertion that the State being without the power to lend its financial aid to private undertakings, it necessarily follows that the legislature cannot grant to a municipal corporation, one of its own creations, a power broader than it itself possesses. (*Schuler* v. *Board of Education,* 370 Ill. 107; *Adams* v. *Brenan,* 177 Ill. 194.) Then, in contending the development of housing units in the manner proposed is not a proper public purpose, plaintiffs argue that State funds have been channeled through the State Housing Board to the local authority where they have been converted into real property and sold to a private corporation for an insignificant, noncash consideration to an end in noway connected with slum clearance, low-rent housing or any other conceivable public purpose. On the other hand, defendants maintain that the property in question was sold for a valid consideration and, more to the point, that, even in the absence of slum clearance and low-rent housing features in the 1947 State Grant Act, the statute provides for the expenditure of State funds for the public purpose of alleviating the critical and desperate housing shortage existing throughout the State.

Upon full consideration of the arguments advanced,

it is evident that the grants in controversy serve a public rather than a private purpose. Section 1 of the 1947 State Grant Act provides as follows: "It is declared as a matter of legislative determination that in order to promote and protect the health, safety, morals and welfare of the public, it is necessary in the public interest to provide financial assistance to housing authorities and Land Clearance Commissions for the purpose of facilitating the construction and development of housing and alleviating the crucial housing shortage which prevails throughout the state; that the uses and purposes for which moneys may be allocated under this act are grounded in public necessity and predicated upon emergency conditions requiring immediate governmental consideration and action; and that the provisions of this Act embrace public objects and governmental functions essential to the public interest." Ill. Rev. Stat. 1947. chap. 67½, par. 53.

The determination of what is for the public good and of what are public purposes are questions to be decided in the first instance by the General Assembly. In this respect, the legislature is vested with a large discretion, its determinations are entitled to much consideration, and courts are not warranted in setting aside its enactment unless clearly evasive of or contrary to constitutional prohibitions. (*People* v. *Chicago Transit Authority*, 392 Ill. 77; *People ex rel. Greening* v. *Bartholf*, 388 Ill. 445; *People. ex rel. Moshier* v. *City of Springfield*, 370 Ill. 541; *Hagler* v. *Small*, 307 Ill. 460.) In the apt language of the *Chicago Transit Authority case*, "Limitations resting in theory only, or on vague ground of doubt, but which the people have been satisfied to leave to the judgment, patriotism and sense of justice of representatives are not within the control of the courts. * * * A large number of acts are to be found on the statute books of this State as indicating the breadth of the concept of a public purpose in legislation. They range all the way from poultry exhibits to

public parks and hospitals. * * * They all evidence the wide range and elastic character of the concept of a public purpose."

Plaintiffs' contention that no housing shortage exists is unfounded. The General Assembly has found that a housing shortage prevails throughout the State—we take judicial notice of obvious and pressing need for more housing—and, further, the record fully affirms the existence of a critical housing shortage generally throughout the State and specifically in Peoria. The necessary consequence of the housing shortage is a danger to the health, safety, morals and welfare of the public. In large segments of the population, housing units designed for single-family occupancy must be utilized for several families. Overcrowding and lack of adequate sanitary accommodations result. Health is menaced because of insufficient living space per person in each unit. The dangers of fire and the spread of contagious diseases are greatly enhanced, while crime, immorality and juvenile delinquency are fostered. Trailer camps and temporary housing units mushroom and are accompanied by problems of sanitation, health, morality, police and fire protection and school facilities. With the passage of time, temporary housing tends to develop into blighted areas with their customary deleterious effect upon the health, morals and welfare of the people. In facilitating the supply of additional housing facilities, the 1947 State Grant Act strikes directly at the social evils inherent in the existing acute shortage of adequate dwellings. This, alone, constitutes a proper public purpose for the expenditure of State funds. The public purpose of the State Grant acts is supplemented to the extent that, although grants are no longer contingent upon the elimination of an equivalent slum area, they promote the development of substantial housing and thus aid in preventing the creation of new blighted areas and permit existing slum areas to be cleared. Slum clearance is, of course, a proper

public purpose. (*People ex rel. Tuohy* v. *City of Chicago,* 394 Ill. 477; *Zurn* v. *City of Chicago,* 389 Ill. 114; *Krause* v. *Peoria Housing Authority,* 370 Ill. 356.) With the housing shortage at its peak the practicality or likelihood of any real progress in slum clearance remains remote.

Plaintiffs further assert that the method of inducing and promoting the construction of new housing provided in the 1947 act does not evidence a public purpose. As recited in section 5, State funds acquired by local housing authorities may be used for any or all of the following purposes: "* * * the purchase and improvement of land, the purchase and installation of temporary housing facilities, the construction of housing units for rent or sale to veterans, the families of deceased servicemen, and for persons and families who by reason of overcrowded housing conditions or displacement by eviction, fires or other calamities, or slum clearance or other private or public project involving relocation, are in urgent need of safe and sanitary housing, and for any and all purposes authorized by the 'Housing Authorities Act,' * * *."

In addition to the foregoing, real property acquired by local authorities may be sold or leased to any of the following: "* * * (1) housing corporations operating under 'An Act in relation to housing,' approved July 12, 1933, as amended; (2) neighborhood redevelopment corporations operating under the 'Neighborhood Redevelopment Corporation Law,' approved July 9, 1941; (3) insurance companies operating under Section 125 of the 'Illinois Insurance Code,' approved June 29, 1937, as amended; (4) non-profit corporations organized for the purpose of constructing, managing and operating housing projects and the improvement of housing conditions, including the sale or rental of housing units to persons in need thereof; or (5) to any other individual, association or corporation desiring to engage in a development or redevelopment project. * * * No sale or lease shall be

made hereunder to any of the aforesaid corporations, associations or individuals unless a plan approved by the Authority has been presented by the purchaser or lessee for the development or redevelopment of such property, together with a bond, with satisfactory sureties, of not less than ten per centum (10%) of the cost of such development or redevelopment, conditioned upon the completion of such development or redevelopment; provided that the requirement of the bond may be waived by the State Housing Board if it is satisfied of the financial ability of the purchaser or lessee to complete such development or redevelopment in accordance with the presented plan. To further assure that the real property so sold or leased shall be used in accordance with the plan, the State Housing Board may require the purchaser or lessee to execute in writing such undertakings as the Board deems necessary to obligate such purchaser or lessee (1) to use the property for the purposes presented in the plan; (2) to commence and complete the building of the improvements designated in the plan within the periods of time that the State Housing Board fixes as reasonable, and (3) to comply with such other conditions as are necessary to carry out the purposes of this Act. Any such property may be sold pursuant to this section for any legal consideration in an amount to be approved by the State Housing Board." Ill. Rev. Stat. 1947, chap. 67½, par. 57.

Manifest it is that the fundamental purpose of government is to promote the public welfare and the end to be accomplished by a particular enactment being lawful, the General Assembly is endowed with wide discretion as to the means to be employed. As concerns the State Grant acts, we cannot say, as a matter of law, that the administrative techniques devised for the proper public purpose of promoting new housing are inappropriate to the end in view or that they offend constitutional principles. The complaint of plaintiffs is that a private corporation and

certain individuals are benefited, that the classification of beneficiaries is arbitrary and unreasonable and that the Peoria Housing Authority did not receive a cash or otherwise valuable consideration from the defendant nonprofit corporation. Since the public generally will benefit from the resultant alleviation of the housing shortage, within limits not transgressed here, benefits which are not direct to the private corporation or individual concerned but merely incidental to the public purpose of the statute do not render the legislation invalid. *People ex rel. Greening* v. *Green,* 382 Ill. 577; *People ex rel. McDavid* v. *Barrett,* 370 Ill. 478; *Hagler* v. *Small,* 307 Ill. 460; *Illinois Farmers' Institute* v. *Brady,* 267 Ill. 98.

The contention that the classification is discriminatory and unreasonable is equally without merit. We know of no more appropriate classes of persons to receive the incidental benefits of State inspired housing than veterans, the families of deceased veterans, and all persons or families who are urgently in need of safe and sanitary housing. The possibility that housing redevolpments may be owned outright by private or nonprofit corporations desirous of establishing moderate, as opposed to low, rentals is immaterial. In the first place, local housing authorities can guard against the construction of elaborate housing and the imposition of high rentals by appropriate contractual provision. Secondly, because of the acute nature of the housing shortage, the need for adequate and decent housing has expanded to include a large portion of the middle income group, persons who can afford to pay moderate rentals.

As to the argument based on the fact that the Peoria Housing Authority did not receive a cash consideration, it ought to suffice to say that the authority received a legal consideration, any legal consideration being expressly permitted by the statute. Contrary to plaintiffs' argument, the agreement of the nonprofit corporation to construct 25 two-story dwellings containing 136 units did constitute a

consideration in addition to the note and mortgage. Certainly the nonprofit corporation suffered a legal detriment in agreeing to the construction program and the State received a benefit in that the public welfare will be served by the consequent partial reduction in the housing shortage. In arguing that *People ex rel. Greening* v. *Green,* 382 Ill. 577, governs the disposition of the case at bar plaintiffs fail to recognize that the State Public Building Authority Act was there held unconstitutional only because it violated section 18 of article IV as being evasive of the prohibition against increasing the indebtedness of the State without submitting the proposition to a referendum. The bonds of the State Public Building Authority were secured by rents payable to the authority by the State. As a result, the indebtedness of the authority was, in effect, the debt of the State and could not lawfully be created without the approval of the electorate. The language in the opinion describing the financing procedure employed as an unconstitutional method of expending almost unlimited amounts of tax money in building projects and borrowing operations applies solely to the constitutional prerequisite of a referendum. Section 18 of article IV is inapplicable to the case at bar and, further, the effect of the 1947 State Grant Act is to make the State and its local housing authorities creditors rather than debtors.

The second principal contention made by plaintiffs is grounded on separate section 2 of the constitution of Illinois. There the organic law provides, "No county, city, town, township or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation." The argument that Peoria Housing Authority, a municipal corporation, has made a donation to or loaned its credit in aid of Illinois Valley Homes, Inc., a private corporation, may be disposed of in all but summary fashion. In the first place, the view may be taken

that separate section 2 does not apply because there are not involved here the funds or properties of a municipality held in its own right. Since housing authorities must hold the funds granted in separate accounts, they may be regarded as mere conduits between the State appropriation and the corporation developing the housing units. The fact that expenditure of State funds and the transfer of real estate so acquired cannot be made without the approval of the State Housing Board lends credence to this view. If the transaction here in dispute is a donation or loan of credit, then it is a loan of credit by the State and not the Peoria Housing Authority and separate section 2 is inapplicable. Secondly, it must be observed that the alleged donee is a nonprofit corporation and the prohibition of separate section 2 applies only to corporations having a capital stock or organized for profit. *People* v. *Chicago Transit Authority*, 392 Ill. 77; *Furlong* v. *South Park Comrs.* 340 Ill. 363.

We prefer, however, to dispose of plaintiffs' second principal contention on still other grounds. The wording of the constitutional prohibition at issue does not preclude a municipality from entering into a transaction with a private corporation where there is an exchange of considerations between the parties and case authorities are to the same effect. (*Maffit* v. *City of Decatur*, 322 Ill. 82; *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* 244 Ill. 220.) As stated in the *Maffit case*, "The exchange of one thing for another does not constitute a donation or loan of the city's credit." *Washingtonian Home* v. *City of Chicago*, 157 Ill. 414, relied upon by plaintiffs, is clearly distinguishable on the basis that no exchange of values was involved there. In point of fact, the city of Chicago appropriated sums not in excess of $20,000 per annum for the care of alcoholics by the Washingtonian Home, without any contract or promise by the home to administer to persons sentenced

to the city jail for drunkenness. As previously noted, in the case at bar the housing authority conveyed real property and the nonprofit corporation gave its note and mortgage and agreed to construct a housing project. This constituted an exchange of values and considerations, thus rendering separate section 2 inapplicable to the transaction.

The decree of the circuit court of Peoria County is affirmed.

*Decree affirmed.*