SIXTH DIVISION
December 21, 2007

No. 1-06-2622

|                         |   |                     |
|-------------------------|---|---------------------|
|                         | ) |                     |
| THE VILLAGE OF OAK LAWN,| ) |                     |
|                         | ) |                     |
| Plaintiff-Appellant,    | ) | Appeal from the     |
|                         | ) | Circuit Court of    |
| v.                      | ) | Cook County, Illinois. |
|                         | ) |                     |
| JOSEPH FABER,           | ) | No. 05 CH 19575     |
|                         | ) |                     |
| Defendant-Appellee.     | ) | Honorable           |
|                         | ) | Sophia Hall         |
|                         | ) | Judge Presiding.    |
|                         | ) |                     |

_____JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff, the Village of Oak Lawn (Oak Lawn), brought a declaratory judgment action against defendant, Joseph Faber, its former long-time employee and village manager, alleging that prior to the date a newly elected village board of trustees was to take office, the outgoing village board voted to terminate Faber's employment so that he could claim a severance package totaling nine months of his salary. Oak Lawn contended that the severance was improper in five respects: that it constituted a gift of public funds (count I), that it was contrary to statutory provisions requiring that a village manager's term be indefinite and that he be terminable at will (count II), that it constituted unjust enrichment (count III), that it was contrary to statutory provisions requiring that the village manager's term not exceed the term of the village president (count IV), and that it violated the prior appropriation rule (count V). The parties brought cross-motions for summary judgment and the circuit court ruled in favor of Faber. Oak Lawn now appeals the circuit court's ruling with respect to counts I through IV. For the reasons that follow, we affirm.

## I. BACKGROUND

Faber was employed by Oak Lawn as "Director of Administrative Services" from 1985 through 1992, and in1993, Faber became the village manager of Oak Lawn. In issue in this case are the contracts Faber and Oak Lawn subsequently entered into continuing Faber's employment as village manager.[1] The first of those contracts, executed, May 11, 1999, stated that Faber would act as village manager from June 1, 1999, through April 24, 2001. That agreement, which was attached as an exhibit to Oak Lawn's complaint, further states in pertinent part as follows:

"I. TERM OF AGREEMENT

***

At any time during the term of this Agreement, in the event that a majority of the Corporate Authorities (4 votes), no longer wish to retain the professional services of FABER, the VILLAGE shall be required to provide written notification thereof to FABER. In the event that such written notification of termination is provided to FABER, the VILLAGE shall be obligated to continue to pay FABER for a period of nine (9) months after notification of termination the herein agreed remunerations and deferred compensation and maintain standard employee benefits for FABER pursuant to the VILLAGE's Pay and Benefits Ordinance and Title 1 of the Oak Lawn Village Code (excluding the accrual of additional benefits effective with notification). In addition, the VILLAGE shall

---

[1] Faber's previous contracts of employment with Oak Lawn, if any, are not part of this appeal and are not in the record.

provide FABER with a lump sum payment for all accrued unused vacation days and up to a maximum of ninety (90) accrued unused sick days at FABER's then current rate of pay. The Village may demand that FABER no longer continue to be the actual employee and/or work in the capacity of Village Manager. The intent herein is to provide a minimum of nine (9) months of continued severance benefits to FABER after his receipt of any written notification of termination, in order to provide FABER with sufficient economic security during the time he is seeking alternative employment.

II. EXTENDING THE TERM/FAILURE TO RENEW

It is hereby agreed by the parties that the employment term may be extended for an additional period anytime during the term of this Agreement, thereby allowing this Agreement to continue in full force and effect in accordance with the desires of the parties involved. In the event the VILLAGE does not, within thirty days (30) after the expiration of the term of this Agreement, renew this Agreement to retain the services of FABER for a period of at least twelve (12) months, under similar terms and conditions of employment, then the VILLAGE shall pay to FABER severance pay in an amount equal to nine (9) months of his then current salary. In addition, the VILLAGE shall continue to maintain, for FABER, standard employee benefits pursuant to the VILLAGE's Pay and Benefits Ordinance and Title 1 of the Oak Lawn Village Code for a period of nine (9) months. Finally, the VILLAGE shall provide FABER with a lump sum payment

for all accrued unused vacation days and up to a maximum of ninety (90) accrued unused sick days at FABER's then current rate of pay. The severance pay and benefits are provided in consideration of his years of service to the VILLAGE and in recognition of the nature of the position held by FABER and the difficulty municipal managers have in obtaining comparable alternative employment. Any severance pay due under the Agreement shall be paid in either a lump sum thirty-one (31) days after the expiration of this Agreement or over a nine (9) month period pursuant to the VILLAGE's normal payroll process at the discretion of FABER, unless the parties agree in writing to an alternative payment schedule.

***

IX. RESIGNATION

In the event that FABER wishes to terminate his services as provided for by this Agreement, a written notice of resignation shall be submitted to the Corporate Authorities no less than thirty (30) days prior to the effective date of said resignation. *** FABER, upon his resignation's effective date, shall be eligible only for benefits contained in and previously accrued pursuant to the VILLAGE's Pay and Benefits Ordinance and Title 1 of the Oak Lawn Village Code.

X. JUST CAUSE TERMINATION

In addition to the termination provisions set forth in the Section I above, after an evidentiary hearing upon written charges *** and a finding of just cause *** the VILLAGE may terminate this Agreement and the services of FABER.

4

Just cause shall be limited to nonfeasance in official duties and/or any felony conviction. In the event of just cause termination, all remunerations, deferred compensation and standard employee benefits shall immediately cease to be paid or accrue other than previously accrued benefits for which FABER is entitled ***. IN addition, the nine (9) months of severance benefits, as set forth above, shall not apply in the case of a just cause termination.

***

XII. EXPIRATION

In the event a new Agreement is not negotiated and signed until after this Agreement has expired, but prior to the running of the thirty (30) days referenced in Section II above, the terms and conditions of this Agreement shall extend until a new Agreement is signed or said thirty (30) days has passed."

Oak Lawn's complaint alleged that on April 30, 2001, the board of trustees and Faber entered into an additional agreement, the "First Amendment to Village Manager Agreement" (hereinafter first amended agreement) which extended Faber's term from April 24, 2001, through "the first regular meeting of the president and Board of trustees in April, 2005." This first regular meeting turned out to be April 12, 2005. Apart from extending the term of Faber's employment, this agreement changed none of the terms of the original agreement.

On April 5, 2005, a new village president and two new trustees were elected by Oak Lawn voters. These officials were to take office on May 10, 2005, at the first regular village board meeting in the May. However, prior to that date, on April 27, 2005, the board of trustees and

Faber entered into the "Second Amendment to Village Manager Agreement" (hereinafter second amended agreement), which extended the term of Faber's employment until May 10, 2005. In addition, the second amended agreement amended the original agreement by changing the 30-day renewal period to 35 days and by adding an alternative method of paying accrued vacation and sick days.

On May 9, 2005, one day prior to the inauguration of the new president and two new board members, the village board convened a special meeting at which it voted, 4 to 1, with one abstention, to terminate Faber's employment. Following the installation of the newly elected officials on May 10, 2005, Oak Lawn paid Faber his severance package in periodic installments. The payments were made pursuant to approval of the village board and were eventually made in full.

On May 30, 2006, Oak Lawn filed a motion for summary judgment in which it argued that the circumstances surrounding Faber's termination and the consequent triggering of the severance package "smack[ed] of impropriety, [and were] an affront to honest government." Specifically, Oak Lawn argued that it was entitled to summary judgment because the undisputed facts established: (1) that the severance package was an impermissible gift of public funds; (2) that "there was no prior appropriation for the last-minute severance package"; (3) that the severance package extended Faber's employment and was thereby contrary to the "Municipal Code's requirements as to the indefinite term of the village manager and that he be terminable at will"; (4) that the severance package impermissibly extended Faber's employment beyond the term of the president; and (5) that the severance package violated Oak Lawn's code of ethics.

6

On June 19, 2006, Faber filed a cross-motion for summary judgment and a response to Oak Lawn's motion in which he disputed Oak Lawn's arguments and further contended that Oak Lawn's claims were barred by the voluntary payment and waiver doctrines. On August 10, 2006, the circuit court denied Oak Lawn's motion and granted Faber's motion in its entirety. The record does not reflect that any oral arguments were presented on these motions.

As below, Oak Lawn argues on appeal that the severance pay constituted an impermissible gift of public funds, that Faber violated Oak Lawn's code of ethics, that he was unjustly enriched, that the amended agreements are void *ab initio* because their renewal periods potentially extended Faber's employment past the term of the village president, and that the agreements, which purported to appoint Faber for a specific term, were in violation of the Municipal Code's requirement that the term of the village manager be indefinite. Faber disputes these contentions and additionally argues that Oak Lawn's claims are barred by the waiver and voluntary payment doctrines.

## II. ANALYSIS

On appeals from summary judgment motions we conduct a *de novo* review. Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Outboard Marine Corp., 154 Ill. 2d at 102, 607 N.E.2d at 1209. Where, as here, the parties file cross-motions for summary judgment, they agree that no issues of material fact exist and invite the court to decide the issues presented as questions of law. Harwood v. McDonough, 344 Ill. App. 3d 242, 245, 799 N.E.2d

7

No. 1-06-2622

859, 862 (2003). However, the mere filing of cross-motions for summary judgment does not preclude a determination that triable issues of fact remain. State Farm Mutual Automobile Insurance Co. v. Coe, 367 Ill. App. 3d 604, 607, 855 N.E.2d 173, 176 (2006). Furthermore, the interpretation and construction of contractual and statutory provisions are questions of law subject to *de novo* review. See Krohe v. City of Bloomington, 204 Ill. 2d 392, 395, 789 N.E.2d 1211, 1212 (2003); Gallagher v. Lenhart, 367 Ill. App. 3d 293, 301, 854 N.E.2d 800, 807 (2006).

As below, Oak Lawn contends that the second amended agreement's 13-day renewal of Faber's employment and the outgoing board's subsequent termination of Faber the day before the new board was to take office were mere devices to provide Faber with severance benefits he was not entitled to. In this regard, Oak Lawn maintains that had the outgoing board not terminated Faber, the new board would not have been obligated to pay the severance benefits. Oak Lawn makes these assertions in support of its claims that the severance constituted an impermissible gift of public funds, that Faber violated Oak Lawn's code of ethics, and that Faber was unjustly enriched. We find that these assertions are premised on an incorrect construction of the employment agreements in this case and that the claims associated with these charges are not supported by the record.

Faber's employment agreement with Oak Lawn, as originally executed and as amended and renewed, sets out very specific and limited means by which Faber's employment with Oak Lawn could come to an end. First, it clearly states that Faber's employment could be terminated at any time by a majority vote of the corporate authorities. In other words, his employment was terminable at will. The employment agreement next contemplates the possibility that Faber's

8

employment could come to an end through Oak Lawn's failure to renew the agreement once its stated term had expired. Under either of these circumstances, Faber would become entitled to the severance pay. We additionally note, however, that the agreement further sets out two circumstances under which Faber would not become entitled to severance: first, if he resigns, and second, if he is terminated for "just cause," which the agreement defines as "nonfeasance in official duties and/or any felony conviction." There is no question here that Faber did not resign and that he was not terminated for "just cause." The employment agreement does not set forth any other possible scenario under which Faber's employment could come to an end.

Thus, despite Oak Lawn's assertions to the contrary, the outgoing board's renewal of Faber's employment through the second amended agreement did not provide Faber with any right to severance that he did not already enjoy by virtue of the original and first amended agreements. If the original agreement had ended without a new agreement being executed, Faber would have been entitled to his severance pursuant to the plain language of the contract. By the same token, if the first amended agreement came to an end without any further agreement being executed, Faber would have been entitled to severance. Thus, Oak Lawn's assertion that the second amended agreement was merely a ruse to provide Faber with severance pay is negated by the fact Faber would have received that benefit anyway.

Similarly, Oak Lawn's assertion that the new board only became obligated to the severance benefits upon the outgoing board's last-minute termination of Faber is unsupported by the actual contract provisions in this case. As noted, it is clear from the plain language of Faber's employment agreements that there were only two scenarios under which Faber would not be

9

entitled to severance upon concluding his employment – if he were to resign, or if he were terminated for cause. Thus, if the outgoing board had not terminated Faber the day before the new officials were to take office, the new board would have been faced with the exact same choices that were available to the old board: it could terminate Faber's employment and pay him the severance package, it could opt to not renew his employment and pay him the severance package, or it could renew his employment.

This interpretation of the contract is consistent with the interpretation apparently given the contract by the outgoing board. The minutes to the May 9 meeting at which Faber was terminated state that the reasons for the termination included that "it was evident that the majority of the new Board and Trustee Streit[2] did not want to retain Mr. Faber and they were not going to honor the severance provisions in his contract." Thus, the outgoing board did not terminate Faber in order to give him something he would not be entitled to claim from the new board; rather, it terminated him to spare him the burden of having to assert his contractual right to the severance package against the new board, which was apparently going to be disinclined to honor the agreement.[3] In other words, the outgoing board merely saved Faber the burden of potentially having to bring suit against Oak Lawn for breach of contract.

Oak Lawn referenced the aforementioned meeting minutes and explanation for the

---

[2]Streit continued to serve on the new board and was the one "no" vote to Faber's termination at the May 9 meeting .

[3]Oak Lawn has not argued that Faber intended to resign and the termination was merely a pretense to obtain the severance.

termination at oral arguments before this court but did not offer any countervailing interpretation for its position that absent the termination, the new board would not have had to pay Faber's severance. Nor does Oak Lawn makes any cognizable argument in its appellate briefs to refute this construction of the employment agreements. Nevertheless, based on its faulty premise, Oak Lawn goes on to argue its specific counts.

Oak Lawn first contends that the severance constituted an unconstitutional gift of public funds in violation of article 8, section 1, of the Illinois Constitution, which states, "Public funds, property or credit shall be used solely for public purposes." Ill. Const. 1970, art. 8, §1. Oak Lawn contends that Faber did not perform work to earn the severance package and that his past performance did not constitute adequate consideration for the severance. We disagree.

Although the constitutionality of severance pay for municipal employees has not yet been specifically addressed by any Illinois court, the issue has been addressed in an Attorney General opinion. See 1997 Ill. Att'y Gen. Op. 020. There, the Attorney General was asked whether a township with fewer than five employees could provide severance benefits, to be paid from public funds, to its employees. 1997 Ill. Att'y Gen. Op. 020. The Attorney General concluded that the payment of severance benefits "is permissible if such benefits form part of an employment agreement or employment policy which has been agreed to by the township and the employees in advance." In his analysis, the Attorney General noted:

> "[C]ompensation and benefits of public employees must *** comply with
> the constitutional requirement that public funds and property be used only for
> public purposes. (Ill. Const. 1970, art. VIII, sec. 1(a).) Thus, it has been held that

11

a payment or allowance in excess of that which was fixed by law or contract at the time when services were rendered, and when no further services are contemplated, is a gift for the private benefit of the individual, which serves no public purpose. [Citation.] Under this principle, it has been held that a terminated municipal employee could not recover monetary compensation for accumulated but unused leave time where no ordinance or contract provided for such compensation. [Citation.] However, post-employment compensation has been permitted where it serves an identified public purpose. Thus, public pension programs generally have been upheld as a form of deferred compensation to insure long, continued service. [Citations.]" 1997 Ill. Att'y Gen. Op. 020.

The Attorney General then concluded:

"[S]everance benefits for public employees which form part of an employment agreement or policy *agreed to in advance* are not prohibited; in such circumstances, no additional compensation is to be paid, although the payment of compensation due under the terms of the agreement or policy is deferred until the employment relationship is completed. A gift or gratuity for the benefit of an employee who will render no further service, which has not been agreed to in advance by the parties, and to whom all compensation has been paid in accordance with an ordinance or agreement, however, would ordinarily not be permissible." (Emphasis added.) 1997 Ill. Att'y Gen. Op. 020.

We find the reasoning of the Attorney General opinion sound and additionally note that its

12

No. 1-06-2622

conclusion is at least indirectly supported by cases cited by Oak Lawn in opposition to Faber's severance. For instance, Oak Lawn cites Ziebell v. Board of Trustees of the Police Pension Fund, 73 Ill. App. 3d 894, 392 N.E.2d 101 (1979). In that case, the plaintiff police officer retired after 26 years of service at the age of 47. Ziebell, 73 Ill. App. 3d at 895, 392 N.E.2d at 102. At the time of his retirement, the Illinois Pension Code provided that any policeman with 20 or more years of service who has reached age 50 would be entitled to a yearly pension equal to half his salary and that the pension would be increased by 1% for each additional year of service over 20 years. Ziebell, 73 Ill. App. 3d at 895-96, 392 N.E.2d at 102-03. On October 1, 1975, after plaintiff's retirement but approximately two months before his fiftieth birthday, the Pension Code was amended to increase the 1% increment for each additional year served over 20 to 2%. Ziebell, 73 Ill. App. 3d at 896, 392 N.E.2d at 103. After reaching the age of 50, defendant initially paid plaintiff at the higher rate but, after being informed by the Department of Insurance that the lower rate should be applied, defendant lowered plaintiff's benefits. Ziebell, 73 Ill. App. 3d at 896, 392 N.E.2d at 103. Plaintiff brought a *mandamus* action, which the trial court dismissed.

The appellate court affirmed, noting that although the amended statute did not expressly indicate that only those retiring subsequent to the statute's enactment were entitled to the higher rate, such a construction was required because the alternative would constitute an unconstitutional gift of public funds. Ziebell, 73 Ill. App. 3d at 897, 392 N.E.2d at 104. The court noted that when the statute was amended to increase the pension benefits, the financing section of the Pension Code was also amended to increase the amount of deductions from the

13

salaries of policemen. Ziebell, 73 Ill. App. 3d at 897, 392 N.E.2d at 104. Thus, under plaintiff's construction of the statute, he would have been entitled to the higher benefit rate even though he was never subject to the higher deductions. Ziebell, 73 Ill. App. 3d at 899, 392 N.E.2d at 104. The court found that such a result would constitute an impermissible gift of public funds. Ziebell, 73 Ill. App. 3d at 899, 392 N.E.2d at 105.

Oak Lawn contends that Faber, like the plaintiff in Ziebell, is not entitled to the additional remuneration because he did not offer any additional consideration for the additional benefits. However, unlike in Ziebell, where the benefits in question stemmed from a postretirement amendment to the Pension Code, the benefits involved here were part of the original employment agreement between the parties. The consideration Faber provided to Oak Lawn for those benefits was the same consideration he provided throughout his employment, namely, his work as village manager. Similarly, the consideration provided by Oak Lawn to Faber included not only his salary and general benefits, but the additional benefit of a severance package that would be deferred until the end of Faber's employment (see 1997 Ill. Att'y Gen. Op. 020) and would only be available if Faber was terminated for other than just cause or not renewed. The plaintiff in Ziebell had no claim for additional benefits because he had retired and ceased paying toward his pension. Faber, on the other hand, never ceased earning his benefits, including the protection of severance pay, until the day he was terminated. In fact, like the Attorney General in the aforementioned opinion, the court in Ziebell recognized that where a benefit is based on an existing contract between the parties, there is no constitutional problem. Ziebell, 73 Ill. App. 3d at 898, 392 N.E.2d at 104 (noting that in Raines v. Board of Trustees, 365 Ill. 610, 7 N.E.2d 489 (1937),

14

retired employees who continued to make contributions into the retirement fund had a contractual relationship with the state and that "because of the contractual nature of the arrangement no constitutional objection could be made on the ground that increased payments were being made for past services").

Oak Lawn also cites O'Fallon Development Co. v. City of O'Fallon, 43 Ill. App. 3d 348, 356 N.E.2d 1293 (1976), to support its position that the severance pay in this case was improper. There, the city of O'Fallon was sued for allowing the name of a private shopping center to be prominently displayed on a city-owned water tower. O'Fallon, 43 Ill. App. 3d at 350, 356 N.E.2d at 1296. The court determined that the "advertising" constituted a purely private use of public property in violation of the Illinois Constitution, noting that the "crucial test" in making such a determination "is whether the attempted use of the municipal property subserves the public interest and benefits a private individual or corporation only incidentally." O'Fallon, 43 Ill. App. 3d at 355, 356 N.E.2d at 1299. The court further stated: "If the private benefits are purely incidental to the public purposes of the act, then *** the Illinois Constitution is not violated." O'Fallon, 43 Ill. App. 3d at 355, 356 N.E.2d at 1299.

Oak Lawn contends along these lines that the Faber's severance pay had no public benefit whatsoever and was therefore unconstitutional. However, the severance was part of Faber's original contract of employment and could not therefore be characterized as a mere afterthought or an unbargained-for gift. Rather, the agreement explicitly recognizes that the severance was part of the village's consideration to Faber in its statement that the severance benefits "are provided in consideration of his years of service to the VILLAGE and in recognition of the nature

15

No. 1-06-2622

of the position held by FABER and the difficulty municipal managers have in obtaining comparable alternative employment." Thus, the severance provision can be viewed as a means to attract eligible candidates to the position and to counteract the disincentive created by the statutory requirement, and reflected in the contract, that the village manager be terminable at will.[4]  Moreover, Oak Lawn cannot dispute that Faber's execution of his duties as municipal manager benefitted the village.  The Illinois Municipal Code (the Code) makes clear that the work of a municipal manager is integral to the day-to-day operations of a municipality.  See 65 ILCS 5/5-3-7 (West 2004) (stating that the municipal manager "shall be the administrative head of the municipal government and *** shall be responsible for the efficient administration of all departments").  Thus, consistent with the rule expressed in O'Fallon, the severance provisions in this case served the public interest in that they helped secure the professional commitment of an individual in an essential municipal government position – a position in which Faber was

_____

[4]This rationale for the severance benefits is also reflected in an affidavit Faber filed as part of his motion for summary judgment.  There, he stated: "During my tenure, the village held elections every two years, and the balance of power on the village board often shifted.  Almost all village elections were contested during my tenure.  When accepting the position of manager, and when agreeing to continue in that position at various times during my tenure, including when signing the contracts at issue in this case, I relied on the village's promise that I would receive severance pay if I were terminated as manager in making my decision to continue in that position. I also took the potential severance benefits into account when negotiating my general salary and other benefits."

16

perpetually subject to termination at the whim of the board. The fact that Faber was compensated for his work and commitment to the village does not invalidate the public benefit his efforts inured to the village.

For the same reasons, Oak Lawn's contention that the severance violates the village's code of ethics fails. The Oak Lawn code provides in pertinent part that its appointed officials and employees "shall conduct the government of the village with integrity and impartiality, without allowing *** the opportunity for personal gain to influence their decisions or actions to interfere with serving the public interest." Oak Lawn Village Code §1-15-1. This code does not prohibit the village and a prospective employee from bargaining the terms of employment; nor does it prohibit the village from offering severance pay as part of an employment contract. As noted above, pursuant to his contracts of employment, Faber would have been entitled to severance regardless of the outgoing board's last-minute termination of him and regardless of the second amended agreement.

Similarly, the same holds true for Oak Lawn's unjust enrichment argument. As noted by Oak Lawn, "unjust enrichment" is defined as "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected. Black's Law Dictionary (8th ed. 2004). Here, Faber and Oak Lawn reached an agreement that Faber would work as municipal manager and, in return, Oak Lawn would pay him a salary and additionally provide him with severance pay if he was terminated for other than just cause or if his employment was not renewed. Thus, Faber's compensation to the village for the benefit of severance pay was his work as municipal manager. The fact that Oak Lawn is now unhappy with

the deal it struck does not mean that the honoring of that deal unjustly enriches Faber. Further, as previously noted, Faber would have been entitled to severance even if the second amended agreement, continuing Faber's employment for 13 days, were never executed and even if the outgoing board had not terminated him. Therefore, those facts do not form a basis upon which to invalidate the severance payments.

Oak Lawn next contends that the first and second amended agreements are in violation of the Illinois Municipal Code because they extended the term of Faber's employment beyond the term of the village president and are, therefore, void *ab initio*. Section 8-1-7(b) states:

"Notwithstanding any provision of this Code to the contrary, the corporate authorities of any municipality may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed, relating to: (1) the employment of a municipal manager ***."
65 ILCS 5/8-1-7(b) (West 2004).

It is undisputed that a new president took office on May 10, 2005. Thus, Oak Lawn contends that the second amended agreement, which ran from April 27, 2005, through May 10, 2005, extended into the term of the new president by at least one day. However, Oak Lawn further argues that the actual overlaps contemplated by the amended agreements were even greater. As noted, section XII of the employment agreement stated:

"In the event a new Agreement is not negotiated and signed until after the Agreement has expired, but prior to the running of the thirty (30) days [35 days in the second amended agreement] referenced in Section II above, the terms and

18

conditions of this Agreement shall extend until a new Agreement is signed or said thirty (30) [or 35] days has passed."

Oak Lawn contends that the first amended agreement violated the Code because, although Faber's term of employment was scheduled to end April 12, 2005, the 30-day renewal period applicable to that agreement potentially extended Faber's term of employment until May 12 – three days into the new president's term. Similarly, Oak Lawn contends that the second amendment was violative of the Code because, in addition to the one-day overlap resulting from the May 10 end date, the 35-day renewal period actually could have extended Faber's employment well into June of 2005.

In support of its application of this rule that a village manager's term cannot exceed the term of a village president, Oak Lawn cites the nineteenth century supreme court case of Milliken v. County of Edgar, 142 Ill. 528, 32 N.E. 493 (1892). In Milliken, the Edgar County board of supervisors appointed Milliken steward of the county poorhouse for a term of three years and agreed to pay him compensation of $1,700 per annum. Milliken, 142 Ill. at 530, 32 N.E. at 493. Milliken faithfully performed his duties, but less than a year after his appointment, the board of supervisors discharged him. Milliken, 142 Ill. at 531, 32 N.E. at 493. Milliken brought an action of assumpsit which the trial court dismissed, and the appellate and supreme courts affirmed. Milliken, 142 Ill. at 531, 32 N.E. at 493. In reaching its decision, the supreme court noted that the creation of poorhouses and the appointment of poorhouse keepers was a power conferred on the counties by statute. Milliken, 142 Ill. at 532, 32 N.E. at 493. The court also noted, however, that although the statute did not place a time limit on the time for which the keeper of the poorhouse could be appointed by the county board, the term of the board members themselves

19

was only one year. Milliken, 142 Ill. at 532, 32 N.E. at 494. The court then concluded:

"In view of these provisions of the statute it would be an unreasonable construction of the statute relied upon, to hold that the legislature intended to clothe the board with authority to enter into a contract with the keeper of a poor house to run for the term of three years. If the board had the power to enter into a binding contract of this character for three years, no reason is perceived why it might not make a contract for five or even ten years, and if this could be done, the hands of succeeding boards would be tied and their powers taken from them. If this important power, the supervision of a poor farm and the care of the unfortunate, may be so far delegated as was attempted in this case, the county might be deprived in a great measure of one of the most important affairs intrusted to its care and supervision." Milliken, 142 Ill. at 532-33, 32 N.E. at 494.

Milliken has been invoked in the more recent the cases of Grassini v. DuPage Township, 279 Ill. App. 3d 614, 665 N.E.2d 860 (1996), and Cannizzo v. Berwyn Township 708 Community Mental Health Board, 318 Ill. App. 3d 478, 741 N.E.2d 1067 (2000), and Oak Lawn additionally looks to these decisions to support its position that the Faber's employment agreements are void. In Grassini, plaintiff entered into an employment contract with DuPage Township to serve in the capacity of township administrator for a four-year period. Grassini, 279 Ill. App. 3d at 617, 665 N.E.2d at 862. The contract provided that Grassini's employment could be terminated only for "various enumerated reasons." Grassini, 279 Ill. App. 3d at 617, 665 N.E.2d at 862. However, approximately three months after the execution of the contract, newly

20

elected trustees, including a new township supervisor, replaced the trustees who had authorized Grassini's contract, and they voted to terminate plaintiff. Grassini, 279 Ill. App. 3d at 617, 665 N.E.2d at 862.

Upon plaintiff's appeal, the appellate court cited Milliken and held that townships, like municipalities, "may not contract to employ persons for terms greater than the period for which the board making the decision has left to serve." Grassini, 279 Ill. App. 3d at 620, 665 N.E.2d at 864. The court concluded that plaintiff's contract was void *ab initio* and explained: "each successive township board should decide for itself which employees are necessary and what their compensation should be." Grassini, 279 Ill. App. 3d at 620, 665 N.E.2d at 864.

Similarly, in Cannizzo, plaintiff brought suit against his former employer, the Berwyn Mental Health Board, for breach of his employment contract. Cannizzo, 318 Ill. App. 3d at 479, 741 N.E.2d at 1068. In 1993, plaintiff entered into a written employment contract with the board for a term of three years. Cannizzo, 318 Ill. App. 3d at 479, 741 N.E.2d at 1068. The contract stated that if neither party gave notice of an intent to terminate the contract by a certain date, it would renew for an additional three years. Cannizzo, 318 Ill. App. 3d at 479, 741 N.E.2d at 1068. Approximately one year later, the parties executed another employment contract that mirrored the earlier contract except for the dates. Cannizzo, 318 Ill. App. 3d at 480, 741 N.E.2d at 1068. Prior to the end of the three-year term of the second contract, the board terminated plaintiff for insubordination and plaintiff then brought his breach of contract claims. Cannizzo, 318 Ill. App. 3d at 479-80, 741 N.E.2d at 1068. The board moved to dismiss plaintiff's complaint, arguing that it did not have authority to enter into either of the contracts because the

21

contracts' terms were longer than the term of the Board, which was a maximum of two years, due to the staggered terms of its members. Cannizzo, 318 Ill. App. 3d at 480, 741 N.E.2d at 1069. Consequently, the board argued that the contracts were *ultra vires* and void *ab initio*. Cannizzo, 318 Ill. App. 3d at 480, 741 N.E.2d at 1069.

The appellate court cited Millikin and Grassini for "the broad proposition that it is contrary to the effective administration of a political subdivision to allow elected officials to tie the hands of their successors with respect to decisions regarding the welfare of the subdivision." Cannizzo, 318 Ill. App. 3d at 482-83, 741 N.E.2d at 1071. The court further noted that this rule is codified in section 8-1-7(b), which as noted above, states that municipalities "may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed." 65 ILCS 5/8-1-7(b) (West 2004). The court then went on to review decisions from several other jurisdictions to illustrate that the rationale behind the rule is to prohibit existing governmental bodies from unduly binding their successors. Cannizzo, 318 Ill. App. 3d at 484-85, 741 N.E.2d at 1072, citing Rawlins v. Levy Court of Kent County, 235 A.2d 840, 841 (Del. 1967) (appointment on the eve of the expiration of the levy court's term was an illegal attempt to deprive its successor of the power to direct and control the office); Zerr v. Tilton, 224 Kan. 394, 400 (1978) (" ' "And the test generally applied is whether the contract at issue, extending beyond the term, is an attempt to bind successors in matters incident to their own administration and responsibilities or whether it is a commitment of a sort reasonably necessary to protection of the public property, interests or affairs being administered. In the former case the contract is generally held invalid and in the latter case valid." ' [Citation.]");

22

No. 1-06-2622

Mariano & Associates, P.C., v. Board of County Commissioners of the County of Sublette, 737 P.2d 323, 329 (Wyo. 1987) (" 'The true test is whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired. ***' [Citation.]" " 'If *** the contract is for the performance of personal or professional services for the employing officers, their successors must be allowed to choose for themselves those persons on whose honesty, skill and ability they must rely.***' [Citation.]"). The Cannizzo court then held the employment contract in its case was void *ab initio* because "a township board may not contract to employ persons for terms greater than the period for which the board and township supervisor making the decision have left to serve." Cannizzo, 318 Ill. App. 3d at 487, 741 N.E.2d at 1074.

Oak Lawn argues that the instant case is like Milliken, Grassini, and Cannizzo and contends that we must, therefore, declare Faber's amended employment agreements void *ab initio* and order him to return the monies he received as severance pursuant to those void contracts. We, however, find dispositive differences between the facts of this case and those involved in the aforementioned cases. Unlike in the cases cited by Oak Lawn where the impositions into the new officials' terms of office were for a matter of years, the longest overlap possible in this case was for approximately one month and was for the specific purpose of providing for continued service from Faber until new service could be secured, either from him or from someone else. But even more overridingly, despite the stated terms in the agreements and despite their renewal periods, Faber was at all times terminable at will. Therefore, regardless of any potential overlap into the new board's term, the new officials were never bound to employ Faber, and had Faber not been

23

terminated by the outgoing board, the new board would have been free to terminate him. As expressed in Milliken, Grassini, and Cannizzo, the problem with contracting beyond the term of the existing governing body is that the new body will be unable to make the decisions and use the discretion for which it was elected. This problem was never a risk under the agreements in this case because Faber was always terminable at will; neither the outgoing board nor the new board was ever in a position where it had to employ Faber against its better judgment.

Oak Lawn, however, contends that section XII of the employment agreements did, in fact, potentially bind future boards because the renewal period is expressed in mandatory terms. As noted, section XII states:

"In the event a new Agreement is not negotiated and signed until after this Agreement has expired, but prior to the running of the thirty (30) [or 35 for second amended agreement] days referenced in Section II above, the terms and conditions of this Agreement *shall* extend until a new Agreement is signed or said thirty (30) days has passed." (Emphasis added.)

Thus, according to Oak Lawn, because this clause contains the direction "shall," it must be construed as depriving the board of the option to terminate Faber during the pendency of the renewal period. In other words, Oak Lawn argues that the new board, coming to office during this 30- or 35-day renewal period, would not be able to terminate Faber at will but would have to either renew Faber's employment or continue to employ Faber until the 30 or 35 days ran out.

We find this construction of section XII of the agreement inconsistent with the unequivocally expressed intent of the parties in the agreement that Faber's employment be

24

terminable at will. It is a basic tenet of contract construction that contracts are to be read as a whole and that each part is to be read in light of the others. Schiro v. W.E. Gould & Co., 18 Ill. 2d 538, 542-43, 165 N.E.2d 286, 289 (1960) ("It is axiomatic that contracts must be construed to give effect to the intention of the parties as expressed in the agreement, and to this end the contract should be construed as a whole, giving effect to every portion of the instrument and preferring that construction which renders the agreement legal rather than void"); Wilson v. Wilson, 217 Ill. App. 3d 844, 850, 577 N.E.2d 1323, 1327 (1991). Here, Oak Lawn urges us to determine that the use of the word "shall" in section XII overrides the clear expression in section I of the agreement that the board can "at any time" terminate Faber's employment. However, Oak Lawn's interpretation of the contract creates a conflict where none need exist. Section XII's statement that the agreement "shall extend until a new agreement is signed or said 30 [or 35] days has passed" addresses a situation where the parties have, as yet, failed to take any action with regard to Faber's continued employment; however, it does not express any intent to preempt the board's right to affirmatively take the action of terminating Faber "at any time." Rather, this section is easily reconciled with section I's "terminable at will" provision by interpreting it as merely allowing for a continuation of the status quo and uninterrupted service from Faber while giving the parties time to reach a new agreement. Thus, if the parties were to fail to act before the last date of the agreement, Faber's employment would continue until the expiration of the renewal period. However, this did not restrict the parties from reaching a new agreement during the renewal period; nor did it restrict the board from terminating Faber pursuant to its ongoing authority to exercise its discretion with regard to employing Faber.

25

No. 1-06-2622

Oak Lawn, however, contends that in his answer to the complaint and subsequent interrogatories, Faber took the position that his term did actually extend into June. Oak Lawn thus argues that Faber's answers constituted a binding admission that his term extended past that of the president, making the contract void.

Paragraph 6 of Oak Lawn's complaint states:

"The First Amended Agreement expired on April 12, 2005. *** On or about April 27, 2005, the Board of Trustees and the Defendant entered into the [second amended agreement]. By virtue of [the second amended agreement], the term of the Agreement was extended from the first regular Village Board meeting in April, 2005 to May 10, 2005. The extension was for approximately 30 days (the Thirty Day Extension).

Faber answered this paragraph as follows:

"Defendant Faber admits the first sentence of Paragraph 6, except that Plaintiff [Oak Lawn] could, within 30 days of the expiration of the term of the Agreement, renew the Agreement to retain the services of Defendant. On April 27, 2005, before the 30-day period expired, Plaintiff and Defendant executed the [second amended agreement]. Defendant admits the second sentence of Paragraph 6. Defendant denies the third and fourth sentences of Paragraph 6."

Faber then gave the following answers to the following interrogatories:

"[Interrogatory:] With regard to your Answer to Paragraph 6 of the Complaint, set forth with specificity each and every fact on which you rely in

26

denying that "by virtue of the [second amended agreement], the term of the Agreement was extended from the first regular village Board meeting in April, 2005 to May 10, 2005."

"Answer: The clause in question is not strictly true because the "term" of the contract can be examined in two ways. The plaintiff's position, apparently, is that the term is only the term described in Article I of the agreement. However, Article XII also describes the term of the agreement, and supersedes the contradictory language in Article I, to the effect that the term of the contract extends for an additional thirty days in to June of 2005 under certain circumstances."

"[Interrogatory:] With regard to your Answer to Paragraph 6 of the Complaint, set forth with specificity each and every fact on which you rely in denying that "the extension was for approximately 30 days (the 'Thirty Day Extension.')."

"Answer: Because of the triggering of Article XII of the agreement, the contract was actually extended until June, 2005."

However, contrary to Oak Lawn's assertion, even if these answers could be construed as admissions by Faber that the actual term of his employment extended beyond May 10, 2005, he cannot be bound by them since such admissions would be to a conclusion of law properly left to the court. Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill. 2d 100, 129, 835 N.E.2d 801, 821 (2005) ("As a general rule, the construction, interpretation, or legal effect of a

contract is a matter to be determined by the court as a question of law"); Charter Bank & Trust of Illinois v. Edward Hines Lumber Co., 233 Ill. App. 3d 574, 579, 599 N.E.2d 458, 462 (1992) ("A party is not bound by admissions regarding conclusions of law, since it is the province of the trial court to determine, based upon properly admitted evidence, the legal effect of the facts adduced"); People ex rel. Department of Public Health v. Wiley, 348 Ill. App. 3d 809, 819, 810 N.E.2d 614, 623 (2004).

In any event, Faber's answers do not strictly admit to a construction of the contract that would be violative of the rule that his term not exceed that of the president. With regard to his denial of the allegation that "by virtue of the [second amended agreement], the term of the Agreement was extended from the first regular village Board meeting in April, 2005 to May 10, 2005," Faber posited that "under some circumstances," "the term of the contract extends for an additional thirty days in to June of 2005 under certain circumstances." This answer does not purport to assert that the new board would be restricted from terminating Faber until June of 2005. Rather, the answer is correct to the extent that if the circumstances where such that Faber was not terminated by the outgoing board, and was not subsequently terminated or renewed by the new board, he would remain employed by virtue of section XII's renewal period until sometime in June 2005. Similarly, with regard to Faber's denial that the second amendment extended his term for approximately 30 days (from April 12 through May 10), his statement that the term actually extended into June of 2005 is not technically incorrect since absent any affirmative action by the board, that is exactly what would have happened. However, as discussed above, this construction of the contract did not, at any time, deny the board the

28

opportunity to terminate Faber at will.

Along these lines, Oak Lawn additionally contends that the agreements violate the Code's requirement that the village manager's term be indefinite. Section 5-3-7 of the Code states in pertinent part:

"[The municipal manager] shall be appointed without regard to his political beliefs and need not be a resident of the city or village when appointed. The manager *shall be appointed for an indefinite term*, and the conditions of the manager's employment may be set forth in an agreement. *** The manager may at any time be removed from office by a majority vote of the members of the council or the board." (Emphasis added.) 65 ILCS 5/5-3-7 (West 2004).

Oak Lawn first argues that Faber's term of employment was not compliant with section 5-3-7's requirement of indefiniteness for the same reason it violated section 8-1-7, namely, because section XII prohibited the board from terminating Faber during the renewal period. However, for the same reasons discussed above, we find this argument unavailing. The renewal period allowed for a continuation of the status quo for a specific period but it did not prohibit the board from exercising its right to terminate Faber at will.

Oak Lawn would further contend, however, that Faber's term was not indefinite in that his employment contracts were for specific periods of time – the original contract ran from June 1, 1999, through April 24, 2001, the first amended agreement ran from April 24, 2001, through April 12, 2005, and the second amended agreement ran from April 27, 2005, through May 10, 2005. However, given the fact that Faber's employment was at all times terminable at will, we

29

find that his term of employment was, in fact, indefinite. The dates expressed in the agreements did not guarantee Faber employment for those periods and they did not limit the board's authority to terminate him; rather, they merely acted to provide a schedule for renewing Faber's employment if the board were to so choose. Section 5-3-7, itself, states that the "conditions of the manager's employment may be set forth in an agreement." 65 ILCS 5/5-3-7 (West 2004). Here, the conditions of Faber's employment included that he would become entitled to severance pay if he was terminated or if his employment was not periodically renewed. Section 5-3-7, also specifically states that the municipal manager "may at any time be removed from office by a majority vote of the members of the *** board." 65 ILCS 5/5-3-7 (West 2004). The agreements in this case are in full compliance with this section because Faber's employment was always subject to approval of the board and he could be removed at any time. These facts, despite the recitation of specific dates within the agreements, clearly made Faber's term of employment "indefinite."

We finally note that in addition to denying Oak Lawn's motion for summary judgment and granting Faber's motion with regard to each of Oak Lawn's counts, the circuit court also granted Faber's motion for summary judgment on his affirmative defenses – waiver and voluntary payment. Faber argues that since the new board (which consisted of at least one member who also sat on the old board) approved the payment of his entire severance over a period of approximately nine months, it should now be prohibited from seeking its return. However, since we find that Oak Lawn's claims fail as a matter of law, we need not additionally address whether Oak Lawn is prohibited from contesting the severance payments through the doctrines of waiver

or voluntary payment.

### III. CONCLUSION

For all the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McBRIDE, P.J., and McNULTY, J., concur.